WO

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Mondre K. Belle, | ) | CV 04-298 TUC DCB |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Patricia Stapler, et al., | ) | |
| Defendants. | ) | |

The Court finds that Defendants were not deliberately indifferent to Plaintiff's medical needs and grants Defendants' Motion for Summary Judgment. The Court denies the Plaintiff's Crossmotion for Summary Judgment.

I.      Procedural Background

Plaintiff is presently confined in the Morey Unit of the Arizona State Prison Complex-Buckeye in Florence, Arizona (ASPC-Buckeye).  Acting pro se, Plaintiff filed this action on June 9, 2004.  On August 2, 2004, Plaintiff filed an Amended Civil Rights Complaint by a Prisoner, pursuant to 42 U.S.C. § 1983.

Plaintiff alleges a claim against the Defendants for being deliberately indifferent to his serious medical needs when they failed to treat his cervical spinal damage and failed to act on specialist recommendations for surgery due to financial reasons.  He alleges that he has suffered numbness in his fingers and toes, pain in his neck and back, and structural damage to his spine.  He seeks preliminary injunctive relief, money damages, and a medical furlough from jail so that he may receive medical care.  On April 19, 2005, this Court denied

1   Plaintiff's request for preliminary injunction, but ordered expedited discovery and disposition

2   of this matter.

3          In his Amended Complaint, Plaintiff complains that he entered ADOC in 2002 with

4   a preexisting medical condition and a recommendation from a neurosurgeon regarding

5   appropriate medical diagnosis, prognosis, and treatment for his cervical spinal condition.

6   (Amended Complaint at 4, 7.)  Specifically, Plaintiff complains that the recommendation for

7   a cervical MRI and surgery were ignored by the Defendants. *Id., see also*, (P's Crossmotion

8   at 3) (it took until June of 2004 before Defendants finally performed the MRI, and he alleges

9   that this delay resulted in worsening of his condition).

10         Defendants filed a Motion to Dismiss for Plaintiff's failure to exhaust administrative

11  remedies. On April 19, 2005, the Court denied Defendants' motion and stayed the case for

12  Plaintiff to exhaust his administrative remedies. He did so on June 22, 2005, and on July 30,

13  2005, the Court lifted the stay and returned the case to its active docket.   After Defendants

14  produced Plaintiff's medical record, they filed a Motion for Summary Judgment on June 5,

15  2006.  Plaintiff's medical records establish that Plaintiff was scheduled for the requested

16  surgery, but refused it on December 29, 2004.  (D's SoF at ¶ 86: Stapler Deposition (Stapler)

17  at 68.)

18  II.      Defendant's Motion for Summary Judgment

19          a.  Plaintiff's claims for relief

20         Defendants' motion for summary judgment correctly states that Plaintiff has sued the

21  Defendants in their official capacity only and that the Eleventh Amendment bars monetary

22  damages. (Defendants' Motion for Summary Judgment at 8) (citing *Edelman v. Jordan*, 415

23  U.S. 651, 662-63, 677-78 (1974)).  The Court could dismiss this claim with leave to amend

24  in order for Plaintiff to add a claim against Defendants in their individual capacity, therefore,

25  the Court will assume *arguendo* that Plaintiff has made such a claim. The standard for relief

26

27

28                                        2

for monetary damages under § 1983 is deliberate indifference by the Defendants to the Plaintiff's serious medical needs.

Under this same standard, a plaintiff is entitled to additional injunctive relief under 42 U.S.C. § 1983 when the defendants are sued in their official capacity. Plaintiff requests that his medical care be transferred to another provider that is not associated with the Arizona Department of Corrections (ADC). His request that this Court order the Defendants to provide the requested surgery is moot because they have done so, and Plaintiff has declined to have the surgery.

b. Summary judgment standard

A party is entitled to judgment as a matter of law where, on the record before the court, there exists "no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). Where there has been a proper motion for summary judgment the non-moving party must present specific facts demonstrating a genuine issue for trial and may not rely upon mere allegations. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986). The evidence upon which the non-moving party relies must be more than merely colorable. *Id.* at 249. It must also be "significantly probative." *Id.* The inquiry by the court must be whether there is any issue that may only be resolved by a fact finder. *Id.* at 250. Essentially, the standard for summary judgment mirrors that of a directed verdict. *Id.*

A plaintiff must come forward with evidence beyond the pleadings to oppose a motion for summary judgment once the defendant has submitted declarations supporting his motion. *Hutchinson v. United States*, 838 F.2d 390, 393 (1988) (citing Fed. R. Civ. P. 56(e)). Furthermore, the Court must grant defendant's motion for summary judgment where plaintiff has failed to establish the existence of an element essential for his case for which he would bear the burden of proof at trial. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

3

The Court must draw all inferences in favor of the non-moving party and must accept all evidence presented by the non-moving party as true so long as the Court believes it is relevant to the present case. *Anderson*, 477 U.S. at 255.

### c. Deliberate indifference standard

A prisoner may establish a violation of 42 U.S.C. § 1983 where he receives inadequate medical care that amounts to "deliberate indifference." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). First, there must be a serious medical need which could lead to further injury or "unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1991)). Second, the plaintiff must show that the prison officials responded with deliberate indifference. *Id.* The test for deliberate indifference is two-pronged: "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Id.*

Deliberate indifference to a prisoner's serious medical needs is proscribed by the Eighth Amendment's restriction against "cruel and unusual punishment." *Estelle*, 429 U.S. at 104. The Eighth Amendment was adopted to limit governmental power, and that limitation extends today to medical care given prisoners confined in prisons. *See e.g. Browing-Ferris Indus. v. Kelco Disposal Inc.*, 492 U.S. 257, 266 (1989). Prison officials are deliberately indifferent to serious medical needs when "they deny, delay, or intentionally interfere with medical treatment." *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson*, 838 F.2d at 394). Not just any delay will be deemed deliberately indifferent. It must cause serious harm to the inmate. *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (citing *Estelle*, 429 U.S. at 106); *see also Wood*, 900 F.2d at 1335.

A claim for deliberate indifference does not arise simply because the patient does not get perfect care. Showing that another doctor may have treated the patient differently does not establish deliberate indifference. *Wood*, 900 F.2d at 1334 (citing *Toussaint v.*

4

*McCarthy*, 801 F.2d 1080, 1111 (9ᵗʰ Cir. 1986)). The Supreme Court has held that "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. Analyzing *Estelle*, the Ninth Circuit has held that "even gross negligence" does not create a constitutional violation. *Wood*, 900 F.2d at 1334.

The provider's state of mind is important to the deliberate indifference inquiry. The Supreme Court has refused to apply a solely objective test for deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Instead, the Court held that deliberate indifference exists where "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Thus, a prison official who does not possess the adequate subjective knowledge may not be found to be deliberately indifferent.

Finally, the *Farmer* Court held that the plaintiff must prove ongoing deliberate indifference in order to obtain an injunction. *Framer*, 511 U.S. at 831. So, the parties may rely on evidence that postdates the pleadings and pretrial motions. *Id.* This allows a plaintiff to bring an action before substantial harm has occurred. *Id.* at 846.

III.    Plaintiff's Medical History

a.    Pre-incarceration

Plaintiff first had his neck and spine examined when he was twelve-years old because he was unable to turn his head from left to right, and it was noted that his spine had naturally fused together. (D's Statement of Facts (SOF); Ex D: P's Deposition (Depo.)). Between 1992 and 1996 Plaintiff saw four neurosurgeons. (D's SOF at ¶ 11). On April 22, 1992, Plaintiff saw Dr. Williams at the University of Arizona who did not recommend fusion even though a previous doctor had recommended surgery in 1985. (D's SOF Ex. B: Stapler's Declaration (Stapler) at ¶ 5) But he did recommend watching Plaintiff's spine for six months, noting that it could deteriorate in the future. *Id.* On October 17, 1994, Plaintiff saw Dr. Smith

at the University of Arizona who did not recommend surgery, but recommended that Plaintiff return in six months for an evaluation, noting that there was 3mm C1-2 subluxation. (Stapler at ¶ 6).

On November 11, 1996, an MRI was conducted during Plaintiff's hospitalization after a bar altercation injuring his neck. (D's SOF; Ex E: P's Depo). During a follow up visit on December 5, 1996, Plaintiff saw Dr. McDonald who evaluated flexion/extension x-rays and found that Plaintiff had "fusion of C 2-3-4 with a motion segment at C4-5, C5-6 and additional fusions of C6, C7 and T1." (Stapler at ¶¶ 7-9). Dr. McDonald recommended surgery, but Plaintiff refused the surgery because he did not have insurance. (D's SOF; Ex F: P's Depo).

   b.  Post-incarceration

Plaintiff entered the Arizona Department of Corrections (ADC) on June 11, 2002. (D's SOF at ¶ 10; Ex A: P's AIMS). He was assessed with having a fusion at C2/C3 and it was stated that "labs would follow." (D's SOF; Ex 5: Transfer Summary).

Plaintiff was transferred to ASPC Florence, Central Unit, on June 18, 2002, and he remained there until August 20, 2002. Cervical Spine (C-Spine) x-rays were conducted on July 18, 2002. The diagnosis was 1) degenerative and discongenic degenerative findings with straightening and reversal, and 2) fusion/anomalous findings. (Stapler at ¶ 12 (citing Ex: 6)). It was further noted that Plaintiff had a head-tilt but that his alignment was satisfactory and that the specific fusions included C2, C3, and C4. *Id.*

On November 5, 2002, Plaintiff was transferred to APSC-Eyman, and on December 4, 2002, Plaintiff filed a Health Needs Request (HNR) asking for a doctor to "recommend surgery to fix spinal column."  (P's Ex: N). Defendant Stapler responded to a HNR on December 4, 2002, stating that an x-ray had been done in July and that another x-ray was not indicated. (Stapler at ¶ 13).

Defendant Stapler met with Plaintiff on January 22, 2003, when she found that he had a normal gait, no distress, and normal movements. (Stapler at ¶ 14). He claimed that he had a circulation problem, which he would not explain, and when Dr. Stapler attempted to question him about his past medical examinations, he laughed at her questions and asked to return to his cell. *Id.*

In a HNR dated February 23, 2003, Plaintiff asked to see a neurosurgeon, and the response noted that he would be scheduled to see an ADC physician and that more of his past medical history was needed—for the time between 1996 and 2002. (Stapler at ¶ 15). On March 5, 2003, Dr. Wohler noted that he had no medical history from the time surgery was recommended in 1996 until Plaintiff's incarceration. Dr. Wohler ordered lab tests and cervical spine films, but he did not meet with Plaintiff. (D' SOF; Ex. C - Wohler's Declaration (Wohler) at ¶ 8). Plaintiff alleges that he provided the records to Dr. Wohler, but the record does not support this. Instead, Plaintiff cites to a request by the Illinois Department of Human Services that Plaintiff have a medical examination to ascertain his right to disability benefits (P's SOF; Ex H), and his HNR of March 14, 2003 stating that he could supply the requested documents and asking to see a doctor. (P's SOF; Ex R).

Additional x-rays were taken on March 10, 2003, and the findings included: (1) congenital anomaly with degenerative and discogenic degenerative findings with translation, and (2) motion at C5-6 with flexion and extension. (Wohler at ¶ 9 (citing Ex 6: X-Ray Report)). The comments suggested an MRI and noted widening of the spinal process between C4-5 and C5-6. *Id.* Dr. Wohler met with Plaintiff on April 2, 2003 with one purpose being to ascertain Plaintiff's medical history from 1996 to 2002. (Wohler at ¶ 10). Plaintiff requested a new mattress, but Dr. Wohler informed him that new mattresses are not handled by medical, and Plaintiff walked out of the visit before Dr. Wohler could obtain a complete medical history. *Id.* Dr. Wohler claims that he did not order any studies or referrals . . .

7

1   [because he] was unable to verify their necessity due to incomplete information from the
2   Plaintiff, who walked out of his visit." (Wohler at ¶ 12).

3       On July 29, 2003, Plaintiff saw Dr. Williams, and he complained of numbness for
4   the past four years.[1] Dr. Williams assessed Plaintiff with C-Spine fusion and blood in his
5   rectum, and he requested an MRI and Plaintiff's medical records "from the streets." (Stapler
6   at ¶ 19). On July 31, 2003, Dr. Williams noted that he had Plaintiff's old medical records,
7   and he saw that an MRI had been conducted in 1996. (Stapler at ¶ 20). At the Medical
8   Review Committee (MRC) meeting that day, where at least three doctors were present, an
9   EMG/nerve conduction study was ordered instead of the MRI. *Id.*

10      On September 2, 2003, Plaintiff submitted an HNR asking to be put on disability
11  because he had been on disability for about 15 years. (Stapler at ¶ 21). Dr. Stapler met with
12  Plaintiff on September 9, 2003, and she diagnosed him with paresthesia of his fingers, neck
13  pain, and she submitted a consult for the EMG/nerve conduction test. She also filled a
14  prescription of Naproxin. (Stapler at ¶ 22).

15      Plaintiff filed another HNR on September 18, 2003, in which he complained of
16  continuing numbness in his hands, and he described it as "bad circulation." (Stapler at ¶ 23
17  (citing Ex 16: HNR)). He also requested that his case go back before the MRC to have the
18  MRI ordered per Dr. Williams's suggestion, and he claimed that 500 mg was "not enough"
19  of his medication. *Id.* Dr. Stapler responded to this HNR on September 23, 2003 that Plaintiff
20  does not have bad circulation, a qualified diagnosis had already been given, and that no more
21  medication was indicated. *Id.*

22      Plaintiff filed another HNR on October 8, 2003 requesting an appointment with
23  either Dr. Stapler or Dr. Wohler to discuss his previous x-rays, and he once again
24  complained that an MRI had been requested by one doctor only to be denied by a committee.
25  (Stapler at ¶ 24 (citing Ex: 17)). Dr. Stapler replied that the x-rays had already been

26
27  ───────────────
    [1] The record does not indicate that he had previously mentioned the numbness to any doctor.
28                                    8

discussed at the last appointment, and she informed Plaintiff that Dr. Williams did not have the authority to authorize an MRI. *Id.*

On November 9, 2003, Plaintiff submitted an HNR requesting a work clearance, and Dr. Stapler responded on November 13, 2003, that it would be discussed at his next appointment. which was the next day.  (Stapler at ¶ 27 (citing Ex: 20)).  On November 14, 2003, Dr. Stapler prescribed Indocin for Plaintiff's pain, and she diagnosed him with chronic neck pain and ulnar neuropathy based on his history. She also discussed the results of the EMG/nerve conduction test with Plaintiff. (Stapler at ¶ 29 (citing Ex: 22)). The test was negative. (Stapler at ¶ 26 (citing Ex: 19)). On that same day, Plaintiff submitted another HNR requesting a new mattress and an incline cushion. Dr. Stapler denied the request on November 18, 2003 because medical does not handle mattresses and because Plaintiff did not meet the requirements for an incline cushion. (Stapler at ¶ 28 (citing Ex: 21)).

Plaintiff submitted two more HNRs, one on November 16, 2003, and the other on November 29, 2003. In the first, he requested that a Health Care Provider look at his spinal diagnosis, and in the second, he asked why the MRI had not been ordered. (Stapler ¶¶ 30-31). Dr. Stapler responded to both saying that the issues had been previously addressed and discussed at Plaintiff's last appointment. *Id.* On December 9, 2003, Dr. Stapler prescribed Naproxin for Plaintiff at his request. (Stapler ¶ 32).  She responded to an HNR dated 1/08/03 [sic] on December 11, 2003, by telling Plaintiff that he did not have a gene disorder and that paralysis was not expected. (Stapler ¶ 33).

On January 15, 2004, Plaintiff submitted an HNR asking if his spine was stable, and Dr. Stapler responded on January 16, 2004, that the Radiologist saw no instability. (Stapler at ¶ 35). On February 8, 2004, Plaintiff was seen on the nurse's line complaining of back and neck pain for 17 years, and he requested an increase in medication. Dr. Stapler ordered Extra Strength Tylenol on February 10, 2004. (Stapler at ¶ 36).

On February 22, 2004, Plaintiff requested a CT myelogram or an MRI as well as stronger medication in an HNR. (Stapler at ¶ 37 (citing Ex: 29)). Dr. Stapler responded on February 27, 2004, that an appointment had been scheduled and that she would not prescribe narcotics. *Id.* In her declaration, she explains that she would not prescribe them "because this is a chronic pain issue and his medical records, in [her] assessment, did not indicate the use of narcotics." (Stapler at ¶ 37).

On March 19, 2004, Plaintiff complained of paralysis and asked to see a neurologist to schedule an MRI so that the medical staff could "stop guessing [his] health away." (D's SOF; Ex: 30). Dr. Stapler responded to this HNR saying that he was being treated for Bell's Palsy, which does not require an MRI and that the paralysis goes away in most people. *Id.*; (Stapler at ¶ 38). Dr. Stapler met with Plaintiff on April 2, 2004, and he mentioned that the Tylenol decreased his neck pain, but that he did not like to take it. (Stapler at ¶ 39 (citing Ex: 31)).

Over the course of the next two weeks, Plaintiff filed four HNRs. On April 22, 2004, he requested that his medical score be raised from a 2 to a 4 or 5 under the ADA, and Dr. Stapler responded on April 30, 2004, that he did not qualify for ADA status. (Stapler at ¶ 40). Also on April 22, 2004, Plaintiff requested an MRI, and Dr. Stapler responded on May 7, 2004, that this had been discussed previously. (Stapler at ¶ 41). On May 1, 2004, Plaintiff requested stronger medication, and Dr. Stapler scheduled him for an appointment with the nurse's line. (Stapler at ¶ 42). Finally on May 2, 2004, Plaintiff asked why he did not qualify for ADA, and Dr. Stapler responded on May 7, 2004, that this issue had been previously discussed. (Stapler at ¶ 43).

On May 26, 2004, Dr. Stapler reviewed Plaintiff's records, and she requested C-spine x-rays and an MRI consult. (Stapler at ¶ 44 (citing Ex: 36)). The x-rays were conducted on June 2, 2004, and they revealed no significant changes and no acute findings. (Stapler at ¶ 45 (citing Ex: 37)). Dr. Stapler saw Plaintiff on June 2, 2004, and when she attempted to

10

discuss her notes with him, he was argumentative and asked to leave the office. (Stapler at ¶ 46 (citing Ex: 38)).

An MRI was conducted on June 21, 2004, which found:

(1) Impression was congenital incomplete segmentation anomalies between the skull base and C4 level and at the C6 through T1 levels;

(2) Advanced C4 through C6 levels. This results in a mild C4-5, and mild to moderate C5-6 spinal stenosis, as well as lateral C5-6 and left C4-5 foraminal compromise; and

(3) focal area of increased T2 signal intensity in the cord at the C5 level, without enhancement or mass effect, likely in the area of nonspecific gliosis. (Stapler at ¶ 47) (citing Ex: 39)).

This same day, a request was sent for a telemedicine neurological consult. (Stapler at ¶ 50 (citing Ex: 42)).

On June 26, 2004, Plaintiff submitted an HNR requesting to see a neurologist and accusing Dr. Stapler of being unprofessional and negligent. (Stapler at ¶ 48). That same day, Plaintiff asked for stronger medications, "opiates or muscle relaxants." (Stapler at ¶ 49 (citing Ex: 41)). On July 8, 2004, Plaintiff again requested opiates or muscle relaxants claiming that the Tylenol was not working. (D's SOF; Ex: 44).

Plaintiff saw a neurosurgeon, Dr. Sanan, on July 2, 2004 for his telemedicine appointment, but the C-spine x-rays were unavailable. (Stapler at ¶ 51 (citing Ex: 43)). On July 13, 2004, Dr. Stapler responded to Plaintiff's request to see a neurologist by noting the July 2 telemedicine neurological consult, and she again refused to prescribe opiates or muscle relaxants for the same reasons she previously gave, which was that his chronic pain did not indicate the use of narcotics. On July 28, 2004, Plaintiff submitted an HNR asking how long it would take to send the x-rays to Dr. Sanan, and Dr. Stapler responded the next day that they had not yet been returned by the radiologist. (Stapler at ¶ 53).

On September 16, 2004, Plaintiff requested a walking waiver to use the sidewalk to protect his neck, and the nurse assessed him with alteration in comfort and referred him to the Health Care Provider. (Stapler at ¶ 54 (citing Ex: 46)).

On September 28, 2004, Dr. Stapler noted that the x-rays were available for Dr. Sanan, and on September 30, 2004, Dr. Sanan submitted a follow-up. (Stapler at ¶¶ 55-56). He noted "significant motion at C5-C6, significant enough to be concerning. The subluxation is significant enough to probably be 4mm . . . possible that I may recommend fusion on this patient given the appearance flexion extension films." (D's SOF; Ex: 56). He wanted to discuss it further with a Neuro-Radiologist.

Plaintiff met with Dr. Adya, an ADC physician on October 14, 2004, where he reviewed the x-rays. (Stapler at ¶ 57). Plaintiff requested a sidewalk order because of pain in neck and arm when walking on an uneven surface. (D's SOF; Ex: 48). Dr. Adya requested the Special Needs Order for the sidewalk to be discontinued if a cervical collar were approved. *Id.* Dr. Adya also discussed Dr. Sanan's notes from September 30, 2004, with Plaintiff. *Id.*

On October 19, 2004, Plaintiff was seen at the Nurse's line complaining of shoulder pain on his left side, moving to the right and into the small of his back. (D's SOF; Ex: 49). He also requested more pain medication and was referred to the Provider. *Id.*

He was issued a soft collar on October 25, 2004, to be worn at all times. *Id.* He only wore the collar for that day, however, and submitted an HNR that same day returning the collar. (Stapler at ¶ 60 (citing Ex: 51)).

He saw Dr. Adya on October 29, 2005 who discontinued Tylenol and prescribed Ibuprofen while waiting for Dr. Sanan's recommendation. *Id.* Dr. Adya had to revert back to Tylenol on November 15, 2004, because Plaintiff complained of stomach pain. (Stapler at ¶ 52).

On December 6, 2004, Dr. Sanan recommended stabilization (surgery) at C5-C6 based on his review of Plaintiff's C-Spine x-rays, which had been administered by ADC. (D's SOF; Ex: 53).

1    On December 8, 2004, Dr. Adya noted an HNR submitted by Plaintiff on November

2   29, 2004 requesting a renewed sidewalk order. (Stapler at ¶ 63 (citing Ex: 54)). He reviewed

3   Dr. Sanan's recommendation and wrote a neurosurgery consult to the MRC and renewed the

4   sidewalk order. *Id.*

5    Plaintiff had a telemedicine consult with Dr. Sanan on December 16, 2004. (Stapler

6   at ¶ 64 (citing Ex: 55)). Dr. Sanan recommended surgical stabilization of C5-C6 because of

7   the subluxation of the spine. *Id.* He also noted that there was degeneration of C4-C5, but it

8   was not unstable, so he did not recommend surgery at this time, noting that it could become

9   necessary in the future. *Id.* The risks, benefits, alternatives, and expectations of surgery were

10   also discussed with Plaintiff. *Id.*

11    That same day, Dr. Sharp noted this consult in Plaintiff's records and noted that

12   Plaintiff complained of back pain, but no neck pain. (Stapler at ¶ 65 (citing Ex: 56)). The

13   records indicate that an anterior approach was recommended for surgery or else a fall could

14   jeopardize the spinal cord.[2] *Id.* Finally, "[t]he following surgery risks were noted: cord

15   injury, neck structures, additional fusion, hardware failure, infection, and voice changes."

16   *Id.*

17    On December 22, 2004, Plaintiff saw Dr. Adya, for a pain control follow-up.

18   (Stapler at ¶ 66 (citing Ex: 57)). He noted that Plaintiff was taking Tylenol 2-3 times per day

19   with good results and that the stomach upset had been resolved by discontinuing Ibuprofen.

20   *Id.* He also planned to issue a new sidewalk pass because Plaintiff had never received the old

21   one and to request labs. *Id.* It was renewed that day. (Stapler at ¶ 67).

22    Plaintiff was scheduled for his surgery on December 29, 2004, but he refused to go

23   through with it. (Stapler at ¶ 68 (citing Ex: 59)). Dr. Sanan explained the risks associated

24   with not undergoing the surgery, and he informed Plaintiff that surgery could be performed

---

[2] The original recommendation by Dr. MacDonald in 1996 was for surgery to be done through the front of the spine with accompanying screws through the side.

at a later date. *Id.* Plaintiff was given a full opportunity to ask questions and to understand the pros and cons of surgery. *Id.* Plaintiff refused to sign his "Refusal to submit to Treatment" form, and the signature line reads, "Inmate refuses to sign this document, risks explained in detail, Reason due to his lawsuit against the Department of Corrections." (D's SOF; Ex: 60). Plaintiff states in his deposition that he does not want surgery because he does not like who is going to perform it, he would prefer that Dr. McDonald perform the surgery. (D's SOF; Ex: K – P's depo. at p. 61, lines 6-22).

Finally, the record reflects that Plaintiff plays basketball as often as he can. (D's SOF; Ex: L – P's depo at p. 50, line 25; p. 51, lines 1-18). He claims that he attempts to play at least nine times a month, and played as recently as November 3, 2005. *Id.*[3]

III.   Deliberate Indifference Claim

Plaintiff has failed to establish a claim for deliberate indifference pursuant to 42 U.S.C. § 1983. Nowhere does the record indicate that Drs. Stapler and Wohler deliberately denied Plaintiff the medical treatment that they believed was necessary for his condition. Plaintiff's numerous, and often overlapping, HNRs were generally answered within one week. There is some evidence that in some instances the Plaintiff tried to use his medical condition to obtain special treatment. For example, he alleged his pain was so severe that he needed surgery and, therefore, requested narcotics instead of Tylenol to treat his pain – but then declined to have the surgery. Plaintiff asked for sidewalk privileges because of pain related to walking on uneven surfaces, but when a cervical color was instead prescribed– he wore it one day and returned it to medical.

There is no indication in Plaintiff's medical records that he was ever denied any treatment for any reason other than differing professional medical opinions between doctors. The Court notes that doctors outside of the prison system are not required to respond to patients' requests on a daily basis, nor are they expected to comply with every request for

---

[3] The deposition was taken on November 10, 2005.

14

specific procedures. Prison doctors cannot be expected to abide by a different standard of care than doctors not within the prison facilities.

Plaintiff complains several times that the MRC denied him the recommended MRI. A committee of doctors, however, may determine the best road to take with respect to medical decisions.  The facts indicate that the surgery ordered by Dr. Sanan was based on the x-rays and not the MRI.  Plaintiff's allegations that the deliberate indifference was because of Defendants' refusal to order an MRI must, therefore, be denied.

Finally, Plaintiff has failed to show that he has, in fact, suffered any harm as a result of the delay in surgery. Although he complains of pain on a daily basis, he continues to play basketball as often as he can. The Court rejects Plaintiff's claim of deliberate indifference because he refused to follow recommended precautions for his condition. Having turned down surgery, Plaintiff's medical care continues in large part to be the same treatment prescribed by Drs. Stapler and Wohler: non-narcotic pain medication. Plaintiff has produced no evidence beyond his pleadings that indicate any basis upon which he could sustain his burden of proof at trial that Defendants were deliberately indifferent to his medical needs.

**Accordingly,**

**IT IS ORDERED** The Motion for Summary Judgment filed by Defendants (document 95) is GRANTED.

**IT IS FURTHER ORDERED** that the Plaintiff's Crossmotion for Summary Judgment (document 97) is DENIED.

/////

/////

/////

/////

/////

15

1        **IT IS FURTHER ORDERED** that the Clerk of the Court shall enter Judgment

2   accordingly.

3        DATED this 21st day of December, 2006.

4

5

6

7                                    David C. Bury

8                           United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                    16